ACME STEEL CO. v. EASTERN VENE-
TIAN BLIND CO.

Civ. No. 4265.

United States District Court
D. Maryland.

Sept. 7, 1950.

234

Glen E. Smith, Harold Olsen, Edward R. Johnston, and Smith, Olsen & Baird, all of Chicago, Ill., and R. Dorsey Watkins and Piper, Watkins, Avirett & Egerton, all of Baltimore, Md., for plaintiff.

William H. Webb, M. Burden, Jr., and Webb, Mackey & Burden, all of Pittsburgh, Pa., and Morton M. Robinson, and Simon E. Sobeloff, both of Baltimore, Md., for defendant.

COLEMAN, Chief Judge.

This is a patent suit involving four patents relating to Venetian blind steel slats and the process and apparatus for their manufacture.

■ First, the Court points out that infringement of three of the four patents of the plaintiff that are in suit, namely, the two Wilson patents and the Morse patent, has been conceded by the testimony of the defendant's chief witness, Hughes. As respects these patents, therefore, the question of infringement is no longer an issue in the case. As to the fourth, the Hunter patent, while a similar concession has not been expressly made on behalf of defendant, the Court believes it has in effect been made, because the argument of noninfringement is too tenuous to have any support in the testimony. Summarized, this argument is that defendant does not by its process whereby die blocks are used, infringe Hunter because it is claimed this process does not give to the steel strip or slat a permanent transverse form, as it is asserted the claims of Hunter prescribe. However, we do not interpret the Hunter claims as prescribing any more in this respect than we find, by the weight of the credible evidence, has actually been done by the defendant in its process.

We come then to the main issue in the case, i. e., the question of validity of the four patents in suit, namely, the two patents to Allen B. Wilson, Nos. 2,294,434 and 2,338,678; one to L. S. Morse and others, No. 2,315,640, and one to Joseph L. Hunter, No. 2,337,047. An analysis of each of these four patents is essential in order to understand what they embrace.

First, as to the patent to Wilson 2,294,-434, issued September 1, 1942, on application filed November 7, 1938, this covers a method and apparatus for forming Venetain blind slats and strip material therefor. There are eleven claims, but number eleven is not involved in the present suit. As stated in this patent, the invention which it is alleged to embody involves the discovery that metal Venetian blind slats, having a concave cross section, may be quickly and economically formed by a rolling and bending process which is carried out in two stages, in the first of which the metal strip is stretched in the region between its edges, leaving the edges substantially unstretched; while in the second stage the metal is bent transversely and the edges are stretched, thus producing a properly concave straight strip having parallel edges.

As further pointed out in this patent, it has been found that the difficulties arising from the use of wooden slats may be overcome by substituting thin strip metal, but that in order to prevent sagging of the

metal it has been necessary to form them with a concave or other non-planar cross section in order to impart stiffness to them, and the higher cost of manufacturing such slats has presented a problem.

Although a metal slat or strip of concave cross section may be formed by a rolling process carried out gradually in several steps, if the strip is originally flat, this method of procedure is expensive, and if the full transverse concavity be imparted to the strip in a single rolling and bending step, an excessive stretching of the edge portion of the strip is produced, with the result that the finished product is unsatisfactory since it is necessary to use material which is relatively thick and soft, and thus unsuitable for Venetian blind slats which must be formed of material both thin and hard in order to have the requisite lightness in weight in the finished product, and sufficient springiness to cause the slats to return to their original shape when bent during use.

All of the ten claims in suit embrace both stages of the Wilson method. Claim 7 is a typical claim.

The claims may be better understood from the following summary of the testimony of Wilson, the patentee, with respect to the development of Venetian metal slats which led up to the conception of his invention. He explained that the metal slats in use up to 1936 were easily bent yet not resilient; and that the next advance was by putting reverse curves in the edges, giving an S-shaped, concave formation, but that this turned out to be relatively little improvement. One Morse had conceived the idea as early as 1936,—which ripened into the Morse patent 2,315,640 in suit, issued April 6, 1943,—of (1) using a very much harder steel than normally used in cold-rolling, and (2) very much thinner material. This represented a great advance in the art in that the metal slat of this type was resilient namely, when bent out of shape it returned to its straight, rigid form by reason of its lateral curvature. However, a number of rejections resulted, due to the seemingly incurable imperfections in the hard steel. Then Wilson conceived the idea which is the

basis of this patent of his, No. 2,294,434, that buckling of the slat, that is, its acquiring a wavy shape, due to the central portion being more elongated than the edge portions, was the main trouble and that it would be easier to correct the buckling if the operation were commenced entirely with material that uniformly had this one characteristic, namely, buckling. Using such material, Wilson developed a two-stage method. By the first stage he puts a buckle in the metal strip by crown rolling it, that is, by passing it over a single roller of concave form, so that its center is higher than its edges. By the second stage, he takes the buckle out by elongating the edges of the strip, thereby making all areas of the strip equally long and equally resilient.

Next in chronological order of issuance is the patent to Morse, No. 2,315,640, issued April 6, 1943, on application filed November 18, 1936, to which we have already referred as being prior in point of conception to the idea embodied in Wilson No. 2,294,434. This Morse patent is not a method or apparatus patent, but a product patent. That is to say, it is for the Venetain blind slat itself. In our analysis of Wilson No. 2,294,434, we have already referred to the salient feature of Morse, which resides in the fact that it utilizes strip material having pre-formed, lateral curvature for the purpose of cutting slats therefrom, the material being of such resilience that the lateral curvature is temporarily removed therefrom when the material is wound in a coil, but that upon unwinding the coil, the pre-formed curvature returns to the material.

There are only two claims in this patent, both of which are in suit. They are substantially the same in language.

The third patent in suit is one to Hunter, No. 2,337,047, issued December 21, 1943, upon application filed June 19, 1939. This is another method and apparatus patent. The alleged invention which it embraces may be summarized by saying that Hunter accomplished with a die block what Wilson, in his earlier patent, No. 2,294,434, accomplished with the crowned roll. However, Hunter's method, unlike that of Wil-

son, is based upon the theory that it is necessary to start with perfectly formed steel and then stretch first the edges and then the center portion, or vice versa; whereas, as we have already explained, the Wilson process is based upon the theory that since it is never possible to obtain perfectly flat steel in a uniform supply, it is desirable to make the strip in the first stage of the process defective in the sense that a buckle is put into it, that is, it is given an undulating form through the crown roller by pulling it over a hump so as to stretch its center portion; and then, in the next stage, the edges are stretched and thereby the buckle, or the undulating condition, is removed.

Hunter says in his patent that the use of crowned rollers helps to improve the straightness and flatness, but requires extremely accurate control of the tension to which the strip is subjected as it is fed through these rolls; and though none of the prior attempts had provided long metallic ribbons free from internal stresses and uniformly flat and straight, he nevertheless claims to have provided by means of the die blocks, an improved method of selectively stretching both the center and the edges of the strip material, by which the amount of stretch imparted to both the center and the edges may be adjusted at will.

There are eight claims in this patent, but Nos. 2 and 7 are not here in litigation. Claim 3 is a typical apparatus claim and claim 8 is a typical method claim.

The last of the four patents in suit is another one to Wilson, No. 2,338,678, issued January 4, 1944, on application of July 26, 1940. This is also a method and apparatus patent. Its object is to obtain a product having a uniform, transverse curvature, in other words, to improve on the method and apparatus of the earlier Wilson patent. This is accomplished by combining with the two-stage process of that patent a third stage in which the transversely curved strip material, after passing through the forming rolls of the second stage, is flexed in a direction transverse to its line of travel, thereby becoming buckled or progressively flattened by there being removed from its successive portions most of the transverse curvature that had been imparted to them by the forming rolls. After passing through this flattening operation, the transverse curvature returns to the strip due to its own resiliency, but to a lesser degree, and a greater degree of curvature is removed in this manner from the strip material which has the greater thickness, with the result that all of the strip material is caused to assume approximately the same transverse curvature.

This patent embraces 19 claims, of which number 8 is a typical method claim and number 14 a typical apparatus claim.

We will now consider the defense of invalidity with respect to each of these patents. First, as to Wilson No. 2,294,434, the defendant claims that it is anticipated (1) by Hunter prior use and patent; (2) by prior use by one Albert T. Potter and a patent issued to him March 9, 1937, No. 2,073,174; (3) by a prior patent to Westaway, No. 471,407; and (4) that it is invalid because it is merely an aggregation, as opposed to a combination of elements.

We believe that all of these contentions are lacking in merit. As to Hunter, he admitted that he knew nothing about center-stretching until he talked with Wilson in February, 1938. While it is true Wilson admits he cannot recall the precise date of his own conception of his center-stretching process, the evidence is clear that Hunter never disclosed it to him. Also, with respect to the Hunter patent itself, we believe that it is not to be treated as the equivalent of Wilson, because the weight of the credible evidence indicates that, while relatively a simple idea, it was novel in that it had never, prior to Hunter's conception of it, been disclosed.

Next, as respects the alleged prior use by and patent to Potter, we find that, although disclosed as early as 1934, Potter's method was not the same as Wilson's or an equivalent. Potter did not accomplish any center-stretching except by pinching, namely, pressing, and this being true, Potter's method was merely a straight rolling method. Furthermore, in his operation there was no vertical adjustment in any of the rolls to correct the inequalities

resulting from what would correspond to the first, i. e., center or crown rolling of Wilson. Also, the Potter method is not shown to have ever been successful, except by mere chance, and was never used to make Venetian blind slats.

Next, as respects the patent to Westaway, No. 471,407, we find that it does not in fact anticipate Wilson because, while Westaway states that tensile strain, that is, stretching, does play a part in his invention, such never occurs except in conjunction with pinching, and there is no pinching whatever in Wilson. This is the basic distinction, and a very material one, —one that cannot be ignored throughout our entire consideration of the patents in suit. We say this because we are satisfied that Wilson's testimony and his demonstrations by physical exhibits and tests as to what occurs under his method, as contrasted with what occurs under the Westaway, Potter or any other preconceived method, prove that his method is not only different, but was an entirely new and a distinct commercial advance in the art.

As Wilson says, you cannot, as a practical matter, pinch the entire surface of the metal strip because of the fact that it is a very thin, hard steel, and to do so requires precision to an eight-millionth of an inch, and that it is inconceivable that any equipment could be built and maintained in the industry that would have such perfection; aside from the fact that steel, that is, common commercial steel, varies to such an extent that it is impossible to follow the variations in it with such exactitude. If a roll is designed for one set of conditions such as a crowned center, and another set of conditions presents itself, the adjustment would not be proper and one could not follow the variations in the defects in the steel. There might be line contact in one or two points in the transverse surface, but to meet the requirements it would be necessary to contact completely the whole center portion, which would be impossible. As Wilson said in the course of his testimony, "That is probably why we did not even mention the pinching process. It is a technical condition which it is impossible to talk about. This,—our method,—was a method of doing the job, and it did the job and it is being used by many people. The other method has never been used. It is not practical and the reason is that it is pinching instead of stretching."

Finally, as to the argument that Wilson patent No. 2,294,434 is merely an aggregation as opposed to a combination of elements, we consider that this also is without merit,—an attempt to make such an impractical distinction between the two types of cases as not to warrant a review of the pertinent decisions.

█ What we have just said with respect to the alleged anticipations of Wilson patent No. 2,294,434 applies with equal force to Hunter patent No. 2,337,047. Defendant asserts that both patents are invalid for the same reasons, which we find without merit as to both.

Defendant also asserts that the Hunter patent is anticipated by the patent to De-Ridder, No. 1,823,489. But we need not dwell on this patent because, among other differences, it has to do with *hot* rolling of entirely different material, namely, a magnesium alloy, which we believe is alone sufficient to distinguish it.

Lastly, defendant asserts there is inadequate disclosure in the claims of Hunter, but we find this point also to be without merit when the claims are read accurately and due consideration is given to the specifications in the patent.

█ Next, as to the patent to Wilson No. 2,338,678, which, as we have seen, adds a third stage to the earlier Wilson patent, it is claimed that it is, first, no invention over that patent; second, it is anticipated by Hunter No. 2,337,047; third, by Morse No. 2,315,640; and fourth, is a mere aggregation, as opposed to a combination of elements.

First, as to whether this third stage of the second Wilson patent does disclose something new, we conclude that it does. What is claimed for it is that it produces uniformity of the lateral arc in a manner and to an extent not previously disclosed. Simple—indeed, *very* simple, as it now appears after the fact. However, no one, prior to Wilson's discovery, had ever real-

ized or ever demonstrated that by merely changing the direction of the strip, its gauge would then be flattened, but that when released it would snap back to a straight, longitudinal form with the lateral arc uniform. . Morse suggests this, to be sure, by his coiling of the material, but this now apparent, and as might be said, phenomenal result, he never recognized and never utilized. So it is not true, as defendant claims, that by simply coiling the resilient strips, as Morse did for his purposes, the effect of Wilson No. 2,338,678 was recognized and utilized.

What we have heretofore said about Hunter in relation to the earlier Wilson patent equally disposes of the claim that Hunter anticipates this later Wilson patent. Similarly, as to the argument that the later Wilson patent is invalid as being a mere aggregation, as opposed to a combination, we likewise find no merit in it.

■ Lastly, we come to the patent to Morse, No. 2,315,640. It is claimed by defendant that this patent is anticipated by Potter and also by patent to Hiram A. Farrand, No. 1,402,589 and patent to Hubert Moore, No. 1,949,653, granted in 1922 and 1934, respectively. In addition, it is claimed that there is an inadequate disclosure in Morse.

■ First, as to Potter, it is claimed that all of the same qualities of the material in Morse were disclosed by Potter. Even were this true, which we do not find is proven by the weight of the credible evidence, we are still not prepared to say that Potter in fact anticipates, because Potter's product was never in fact applied to blinds. In dealing with combinations of this sort we must bear in mind that it is fundamental in the law of patents that a combination may be patentable even if all of its elements are old and all have been previously known and used, if they are combined in such manner as to produce something new and useful.

With respect to Farrand, while his patent does prescribe a resilient steel tape or strip, it is part of an entirely different combination with an entirely different use, namely, as a measuring tape. So Farrand clearly does not anticipate Morse.

With respect to Moore, while this patent does, to be sure, disclose a metal strip used in a Venetian blind, there is nothing in it to indicate that use of a resilient slat was ever contemplated. So we conclude that Moore does not anticipate Morse.

Finally, as to the argument of inadequate disclosure, we find that this is without merit with respect to Morse.

So much, then, for the question of (1) invalidity by prior use and patents; (2) aggregation versus combination; and (3) inadequate disclosure. To summarize, we find that none of these defenses is tenable. None has been proven to the satisfaction of the Court, by the weight of the credible evidence, with respect to any one of the four patents in suit.

■ We come, therefore, to the remaining defenses set out by the defendant, namely, laches and unclean hands. With respect to laches, we find that post-war conditions must be taken into account and that, because of them, a more liberal application of the doctrine of laches is justified than might otherwise be the case. Furthermore, we do not find that anything which was said to defendant on behalf of plaintiff actually lulled the defendant into a sense of security that it would not be sued. There is no evidence that defendant has changed its position or will be damaged as a result of any of plaintiff's representations, or delay in announcing its position or in bringing suit.

Finally, we come to the defense of unclean hands,—that the plaintiff's conduct with respect to its license agreements has been of such character as not to entitle it to have any of its patents upheld, but that, on the contrary, because of such conduct, apart from all other considerations, the complaint should be dismissed.

■ All of plaintiff's license agreements, with the exception of the so-called second-stage license agreement, are admitted by defendant to have been modified either before or since the bringing of the present suit, so as to eliminate from these agree-

ments so-called restrictive or tying-in clauses forbidden by Supreme Court decisions, notably in B. B. Chemical Company v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367, and Mercoid Corporation v. Minneapolis-Honeywell Regulator Company, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396. Therefore, the issue of unclean hands narrows itself down to the single question whether the form of license agreement which plaintiff has made with some four hundred licensees is contrary to law, in the light of what the Supreme Court has said. Defendant claims that it is and that, as a result, since plaintiff has had an opportunity to purge itself in this respect and has not done so, plaintiff's conduct should be treated as sufficient warrant for dismissing the complaint. In essence, defendant's complaint with respect to plaintiff's second-stage license agreement is that whereas the former Paragraph Two of this agreement, which *expressly* required licensees to purchase unpatented center-stretched slat stock from plaintiff and its licensees, has been eliminated, the illegal condition in the license still remains,—because under the agreement the licensee is still required to buy his slat stock from the plaintiff or one of its licensees. While the modified language does support this argument, counsel for plaintiff have denied that it is so intended. Nevertheless, we believe that the present Paragraph One of the agreement and all other directly related paragraphs should be so rephrased as to make it *entirely clear,*—which is not true at present,—that the license granted is to practice the second-stage process with the use of slat stock no matter where procured, provided it is produced by the first-stage process. We say this because to phrase the license otherwise would be tantamount to saying that it was the grant of a greater right than the plaintiff can legally make, because, while it has a valid patent, as we find, for the first-stage process as a separate process, and also for the second stage of the process in combination, it has no patent right with respect to the separate use of the first-stage process.

For these reasons we will require modification of all of plaintiff's second-stage license agreements, as just indicated, but beyond this we think the defense of unclean hands is untenable, and should not be permitted to affect our conclusions with respect to the validity of all four of the patents as herein explained.

Our conclusions, therefore, as to the patents are as follows:

(1) All four patents have been infringed.

(2) They are all valid as respects all of their claims in suit.

A decree will be signed in accordance with this opinion.